AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

| | FILED |
|---|---|
| | **Dec 10, 2020** |
| | CLERK, U.S. DISTRICT COURT |
| | EASTERN DISTRICT OF CALIFORNIA |

In the Matter of the Search of )
)
)
8507 Central Ave, Orangevale, CA 95662 )
)
)

Case No.  2:20-sw-1119 AC

# SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A-1, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B-1, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252 (a)(4)(B); 18 U.S.C. § 2252(a)(2); 18 U.S.C. § 2252 9 (a)(1)&(2) | Possession of child pornography; Receipt of child pornography; distribution of child pornography |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☐ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____/s/ Orcina A. Pacheco-Garcia_____
*Applicant's signature*

_____Orcina A. Pacheco-Garcia_____
*Printed name and title*

Sworn telephonically before me.

Date: ___December 9, 2020___

City and state: ___Sacramento, California___

**ALLISON CLAIRE**
**UNITED STATES MAGISTRATE JUDGE**

McGREGOR W. SCOTT
United States Attorney
ROGER YANG
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of: | CASE NO. |
| 8507 CENTRAL AVE, ORANGEVALE, CA 95823 | |
| and | AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT |
| INFORMATION ASSOCIATED WITH TWITTER ACCOUNT: VST10249297 STORED AT PREMISES CONTROLLED BY TWITTER | |

I, Orcina A. Pacheco-Garcia, a Special Agent (SA) with Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

**I.      INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation and have been since March 2019.  I have worked for the Federal Bureau of Investigation in other capacities since September 2017.  I am currently assigned to the Sacramento Division.  While employed by the FBI, I have investigated federal criminal violations related to, among other things, the exploitation of children and human trafficking.  I have gained experience through training at the FBI Academy as well as by conducting these types of investigations.  As part of my daily duties, I investigate criminal violations relating to child exploitation and child pornography, including, but not limited to, violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C.

1

§§ 2251, 2252, and 2252A.  In the course of my employment, I have observed and reviewed numerous examples of child pornography in all forms of media, including computer media.  Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251, 2252, and 2252A, and I am authorized by the Attorney General to request a search warrant.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **8507 Central Ave, Orangevale, CA 95662** (hereinafter, "SUBJECT RESIDENCE"), which is more specifically described in Attachment A-1, and the person of  **Joey Donald Stewart Campbell** for contraband and evidence, fruits, and instrumentalities of 18 U.S.C. § 2252(a)(4)(b) (Possession of Child Pornography) and 18 U.S.C. § 2252(a)(2) (Receipt and/or Distribution of Child Pornography), which items are more specifically described in Attachment B-1.

3.      I also make this affidavit in support of an application for a search warrant for information associated with Twitter account **VST10249297** (hereinafter, "SUBJECT ACCOUNT") that are stored at premises controlled by Twitter, Inc., which manages records on behalf of  Twitter and is an electronic communications and/or remote computing service provider headquartered at 1355 Market St #900, San Francisco, California.  The information to be searched is described in the following paragraphs and in Attachment A-2.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Twitter to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B-2.  Upon receipt of the information described in Section I of Attachment B-2, government-authorized persons will review that information to locate the items described in Section II of Attachment B-2.

4.      The statements in this affidavit are based in part on information received from the Sacramento Sheriff's Office, as well as on my own investigation of this matter.  Since this affidavit is being submitted for the limited purpose of showing probable cause to secure a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband and evidence, fruits,

2

and instrumentalities of the above listed violation(s) are located at the SUBJECT PREMISES and/or in the SUBJECT ACCOUNT.  Unless specifically indicated, all conversations and statements described in this Affidavit are related in substance and in part.

## II.      **PROBABLE CAUSE**

5.      On May 27, 2020, the FBI Sacramento Field Office received a National Center for Missing and Exploited Children (NCMEC), CyberTipline Report, from the Sacramento County Sheriff's Office. Twitter submitted CyberTipline Report 66559321 that reported the possession, and distribution of child pornography images by Twitter username Vst09361525.

6.      On June 03, 2020, a Preservation letter was sent to Twitter for User ID Vst09361525. On June 4, 2020, Twitter responded to the Preservation Letter with the following response: "We can confirm Twitter suspended and reported the account, @Vst09361525, to the National Center for Missing and Exploited Children (NCMEC). Along with our report, we provide a preservation .zip of the account to NCMEC."

7.      On June 30, 2020, a federal search warrant, case number 2:20-SW-0590 CKD, regarding Twitter for account "VST09361525", was issued out of the Eastern District of California by U.S. Magistrate Carol K. Delaney. On September 18, 2020, Twitter responded to the search warrant by providing all of the files pertaining to NCMEC CyberTipline Report 66559321.

8.      As part of my investigation, I received all of the above information and reviewed the NCMEC CyberTipline Report 66559321 regarding the suspected child pornography files that were uploaded to the Twitter account associated with IP address 67.174.35.178 and 67.182.169.16.  Based on my review of the files provided, the Twitter account contained 16 images depicting child pornography and erotica. Twitter reviewed and confirmed the images as child pornography prior to sending the report to NCMEC.

9.      The following are samples of the image files containing child pornography that were associated with this Twitter account and which I reviewed:

    a)  Twitter File Name "5ntKj8s0"

        Description of file: This is an image depicting a prepubescent girl appearing to be the age

3

of a toddler. The toddler is sitting with her face towards the camera and there is a male penis in front of her with the head of the penis touching her lips. One of her hands is placed over the head of the penis while the other lies on top of a pink doll.

  b) Twitter File Name "IVZTQpv9"

  Description of file: This is an image depicting a prepubescent girl who is lying down, face up, her legs open and her hands up. She is wearing a tiger custom in the form of a dress with an artificial nose. The dress is lifted up from the waist down and there is a male penis penetrating her small vagina.

  c) Twitter File Name "a9XwrfXl"

  Description of file: This is an image depicting a prepubescent girl, fully naked standing in front of a brown table. The girl is holding on to the table, as a fully naked, male adult, stands behind her, appearing to be penetrating her from behind. The male has his hand pressed on the front of her hip while he pulls her hair back, tilting her head back.

10. Twitter NCMEC report for User ID Vst09361525, provided the following account information: ESP User ID 1242134010387525633, phone number (279) 201-1431 and a log of recent IP addresses. IP addresses 67.174.35.178 was used to register Twitter account on 03/23/2020 at 17:00:16 UTC and additionally used for subsequent logins on 03/25/2020 at 23:48:11 UTC and 03/25/2020 at 23:47:59 UTC. IP address 67.182.169.16 accessed Twitter on 03/26/2020 at 20:30:48 UTC, and on 03/26/2020 at 20:33:00 UTC was used to login into the subject's Twitter account. IP addresses 67.174.35.178 and 67.182.169.16 were identified as belonging to Comcast communications. An Administrative Subpoena was sent to Comcast for information associated with IP addresses.

11. On June 4, 2020, Comcast provided subscriber information for the IP address 67.174.35.178 and 67.182.169.16. The IP addresses were associated with the Subscriber Name "Paul Bailey," a subscriber address of 8507 Central Ave, Orangevale, Ca 95662, and the phone number (916) 406-3799.

12. A subpoena was issued to Comcast for subscriber information on phone number (279) 201-4131. On June 22, 2020, Comcast provided the following subscriber information: Subscriber Name:

4

Paul Bailey, Address: 8507 Central Ave, Orangevale, CA 95662, Bill-To Name: Joey Campbell, Start of Service: 12/13/2019 and Status: Active.

13.     In July 2020, Google through the Google YouTube infrastructure submitted three different NCMEC Cyber Tip Reports 74683452, 74567026 and 74550281.  The NCMEC reports contained three different webpage URLs which were indicative of child pornography. The login IP address connected to the videos was 67.175.35.178.  Google provided the URLs below but did not provide the contents of the URLs.

        A.  https://www.youtube.com/watch%3Fv%3DNeQTNxMjjPU%26lc%3DUgytsJ1_
              Wk9S99tyGMZ4AaABAg

        B.  https://www.youtube.com/watch%3Fv%3DkNAPss7B7Eg%26lc%3DUgyEHc9w
              yIwS5guDwFJ4AaABAg

        C.  https://www.youtube.com/watch%3Fv%3DkNAPss7B7Eg%26lc%3DUgxMHZR
              24d83bSkv4N4AaABAg

14.     On November 12, 2020, a deconfliction search in the local Sacramento Sheriff's Office database, revealed Joey Campbell was being investigated by Sacramento Sheriff's Office on another NCMEC Cyber Tip Report 66415512.  The following is a summary of the investigative work completed on the Cyber Tip by the Sacramento Internet Crimes Against Children Task Force:

15.     On 3/23/2020, Twitter reported to NCMEC that on 03/22/2020 at 19:09:46 UTC a user associated with uniform resource locator (URL) address https://twitter.com/VST10249297 had uploaded images suspected to be child pornography.

16.     Twitter Provided the following subscriber information associated with the Cybertip:

- Phone: +19166937544
- Email Address:          inono@comcast.net
- Screen/User Name:       VST10249297
- ESP User ID:            1016062854145830912
- Profile URL:            https://twitter.com/VST10249297

17.     Law enforcement database checks for telephone number 916-693-7544 revealed the

5

telephone number was associated to "Joe Campbell" as of January 2020.  The address for "Joe Campbell" was listed as 8507 Central Ave, Orangevale, CA 95662.  The carrier was listed as Verizon Wireless.  Consumer Bureau-Inquiry indicated the phone number was obtained on January 24, 2020.

18.     On December 3, 2020, a law enforcement database check was conducted on 8507 Central Ave, Orangevale, CA 95662 and the following individuals were listed as residents at the address: Doreen Marie Bailey also known as Doreen Campbell, Paul Richard Bailey, Jerry A Kirchner, Joey Donald Campbell and Jazmin Rogers.

19.     A Sacramento Sheriff's Detective reviewed the NCMEC CyberTipline Report 66415512 regarding the suspected child pornography files that were uploaded to the Twitter account. IP address 67.174.35.178 used for login on 03/23/2020 at 16:56:42 UTC and 67.182.169.16 used for logins on 03/23/2020 at 14:45:19 UTC match the IP addresses used in the NCMEC report for Twitter account Vst09361525.  On the review of the files provided, the Twitter account contained 8 images depicting child pornography and erotica.

20.     The following are samples of the image files containing child pornography that were associated with this Twitter account and which I reviewed:

a.   File Name: 079KmuHY.png

This was a color image depicting a naked prepubescent girl who was lying on her back. The girl's breasts were not developed and there was no pubic hair on her vagina.  At the bottom of the image an adult male's groin area was partially visible and he was anally penetrating the girl with his penis.

b.   File Name: NGF1Leyw.png

This was a color image depicting a prepubescent boy lying on his back.  The child's pants were pulled down such that his erect penis was exposed and an adult male was holding the child's penis between his left thumb and index finger.

c.   File Name: NmXNs-Ei.png

This was a color image depicting a prepubescent girl who was crouched on the floor looking upward toward the camera.  There was an off-white substance on the girl's face

6

1     which appeared to be semen.  At the bottom of the image was an erect adult penis and

2     part of an adult male's legs.  At the left of the photo was the hand of the adult male which

3     was holding the hair of the child.

4     21.     Joey D. Campbell is a registered sex offender, previously convicted of PC 311.11

5 possession of child pornography on March 13, 2014. On March 16, 2020, Joey Campbell completed and

6 signed his annual Sex Offender Registration form listing his phone number as (916) 693-7544 and his

7 address as 8507 Central Ave, Orangevale, CA.

8     **III.**     **DEFINITIONS**

9     22.     The following definitions apply to this Affidavit and Attachment B-1 and B-2:

10     a.     "Chat," as used herein, refers to any kind of text communication over the Internet

11 that is transmitted in real-time from sender to receiver.  Chat messages are generally short in

12 order to enable other participants to respond quickly and in a format that resembles an oral

13 conversation.  This feature distinguishes chatting from other text-based online communications

14 such as Internet forums and email.

15     b.     "Child Erotica," as used herein, means materials or items that are sexually

16 arousing to persons having a sexual interest in minors but that are not necessarily, in and of

17 themselves, obscene or that do not necessarily depict minors in sexually explicit poses or

18 positions.

19     c.     "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of

20 sexually explicit conduct where (a) the production of the visual depiction involved the use of a

21 minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer

22 image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged

23 in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to

24 appear that an identifiable minor is engaged in sexually explicit conduct.

25     d.     "Computer," as used herein, refers to "an electronic, magnetic, optical,

26 electrochemical, or other high speed data processing device performing logical or storage

27 functions, and includes any data storage facility or communications facility directly related to or

28

operating in conjunction with such device" and includes mobile phones and devices. *See* 18

U.S.C. § 1030(e)(1).

e.  "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f.  "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g.  "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

h.  "Computer software," as used herein, is digital information that can be interpreted by a computer and any of its related components to direct the way it works.  Computer software

is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

i.     A provider of "Electronic Communication Service" ("ESP"), as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire or electronic communications.  For example, "telephone companies and electronic mail companies" generally act as providers of electronic communication services.  See S. Rep. No. 99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.

j.     "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as the Internet.  FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

k.     "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer to access the Internet.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

l.     "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

m.     "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

n.     "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

o.   "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

p.   "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2),  means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

q.   "Short Message Service" ("SMS"), as used herein, is a service used to send text messages to mobile phones.  SMS is also often referred to as texting, sending text messages or text messaging.  The service allows for short text messages to be sent from one cell phone to another cell phone or from the Web to another cell phone.

r.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

s.   "Webcam," as used herein, refers to a front-facing video camera that attaches to a computer or that is built into a laptop or desktop screen.  It is widely used for video calling as well as to continuously monitor an activity and send it to a Web server for public or private viewing.  Webcams generally have a microphone built into the unit or use the computer's microphone for audio.

## IV.   CHARACTERISTICS COMMON TO INDIVIDUALS WHO SOLICIT, RECEIVE, AND/OR PRODUCE CHILD PORNOGRAPHY

23.   Based on my previous investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who solicit, receive and/or produce images of child pornography:

a.   Individuals who solicit, receive, and/or produce child pornography may receive

10

sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.   Individuals who solicit, receive, and/or produce child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.   Individuals who solicit, receive, and/or produce child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.    Likewise, individuals who solicit, receive, and/or produce child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly.

e.   Individuals who solicit, receive, and/or produce child pornography also may

11

correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.    Individuals who solicit, receive, and/or produce child pornography prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

g.    Based on the above, I believe that the subject, or another user of the SUBJECT ACCOUNTS linked to the SUBJECT PREMISES, likely displays characteristics common to individuals who solicit, receive and/or produce child pornography.

## V.    BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, THE INTERNET, AND EMAIL

24.    I have had both training and the experience and training of other law enforcement officers with whom I have had discussions in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

a.    Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.    Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner.  Furthermore, with the advent of digital cameras and smartphones with cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera or smartphone to the computer.  In the last ten years, the resolution of pictures taken by digital cameras and smartphones has increased dramatically, meaning that such have become sharper and crisper.

12

Photos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards often store 32 gigabytes of data or more, which provides enough space to store thousands of high-resolution photographs and/or hours of video footage. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

c.     A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

d.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-Terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs

13

and DVDs are unique in that special software must be used to save or "burn" files onto them).
Media storage devices can easily be concealed and carried on an individual's person.

e.      The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.      Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

g.      As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files.  Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

## VI.      COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

25.      As described above and in Attachment B-1, this application seeks permission to search for records that might be found at the SUBJECT PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

26.      *Probable cause.*  I submit that if a computer or storage medium is found on the

14

SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

     a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

     b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

     c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

     d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    27.  *Forensic evidence.*  As further described in Attachment B-1 and B-2, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes

15

described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage

16

media was accessed or used.  For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought,

17

computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

28.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

29.    *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

30.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

31.   Several people share the SUBJECT PREMISES as a residence.  It is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## VII.   TWITTER

32.   Snapchat is a social networking service owned by Twitter and headquartered at 1355 Market St #900, San Francisco, CA.

33.   Twitter owns and operates a free-access social-networking website of the same name that

19

can be accessed at http://www.twitter.com. Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information. Twitter also permits users create and read 280 character messages called "Tweets," and to restrict their "Tweets" to individuals whom they approve. These features are described in more detail below.

34.     Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20 characters or fewer to identify his or her Twitter account. The Twitter user may also change this username, password, and name without having to open a new Twitter account.

35.     Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter. This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers. For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

36.     A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile and can also change the profile background or theme for his or her account page. In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

37.     Twitter also keeps IP logs for each user. These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

38.     As discussed above, Twitter users can use their Twitter accounts to post "Tweets" of 280 characters or fewer. Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Twitter users can also "favorite," "retweet," or reply to the Tweets of other users. In addition, when a Tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that Tweet a "mention" of the identified user. In the "Connect" tab for each account, Twitter provides the user with

a list of other users who have "favorited" or "retweeted" the user's own Tweets, as well as a list of all Tweets that include the user's username (i.e., a list of all "mentions" and "replies" for that username).

39.     Twitter users can include photographs or images in their Tweets. Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

40.     Twitter users can also opt to include location data in their Tweets, which will reveal the users' locations at the time they post each Tweet. This "Tweet With Location" function is off by default, so Twitter users must opt in to the service. In addition, Twitter users may delete their past location data.

41.     When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co. This link service measures how many times a link has been clicked.

42.     A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates. Each user profile page includes a list of the people who are following that user (i.e., the user's "followers" list) and a list of people whom that user follows (i.e., the user's "following" list). Twitters users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve, rather than to the public (which is the default setting). A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

43.     In addition to posting Tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers. These messages are typically visible only to the sender and the recipient, and both the sender and the recipient have the power to delete the message from the inboxes of both users. As of January 2012, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

44.     Twitter users can configure the settings for their Twitter accounts in numerous ways. For

21

example, a Twitter user can configure his or her Twitter account to send updates to the user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

45.     Twitter includes a search function that enables its users to search all public Tweets for keywords, usernames, or subject, among other things. A Twitter user may save up to 25 past searches.

46.     Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

47.     If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

48.     In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

49.     Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

### VIII.     <u>CONCLUSION</u>

50.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B-1 of this Affidavit, are located at the SUBJECT PREMISES, described in Attachment A-1.  I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES, authorizing the seizure and search of the items described in Attachment B-1.

51.     Based on the forgoing, I also request that the Court issue the proposed search warrant on TWITTER who will then compile the requested records at a time convenient to it, reasonable cause

exists to permit the execution of the requested warrant at any time in the day or night.

52.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service or execution of this warrant.

## IX.     REQUEST FOR SEALING

53.     Due to the sensitivity of this investigation the disclosure of the search warrant, this affidavit and/or the application, and the attachments thereto, will jeopardize the progress of an ongoing investigation, it is requested that this warrant be filed under seal.  Accordingly, I request that the Court issue an order that the search warrant, the affidavit in support of the application for the search warrant, and all attachments thereto be filed under seal until further order of this Court.


                                        /s/ Orcina A. Pacheco-Garcia
                                        ORCINA A. PACHECO-GARCIA
                                        Special Agent
                                        Federal Bureau of Investigation


Sworn before me telephonically this 9th day of December, 2020.

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

Approved as to form by

/s/ ROGER YANG
_____
ROGER YANG
Assistant United States Attorney

## ATTACHMENT A-1

## DESCRIPTION OF LOCATION TO BE SEARCHED



The location known as **8507 Central Ave, Orangevale, CA 95662** is identified as follows:  A

single-story residence with cream coloring and light brown trim.  There is a two-car garage located

at the front of the house. The numerals "8507" are offset and nailed to the front of the house. The

numerals "8507" are painted in black and white on the sidewalk directly in front of the home.

Google maps also identified this location as **8507 Central Ave, Orangevale, CA 95662.**  The

premises to be searched includes all rooms, attics, basements, and other parts therein, the

surrounding grounds and any garages, storage rooms, or outbuildings of any kind located thereon or

in the possession of the occupants of 8507 Central Ave, Orangevale, CA 95662.  Additionally, the

premises to be searched includes Joey D. Campbell and anywhere within the premises of cellular

devices or other digital devices or media may be found, including vehicles parked on the premises.

1

**ATTACHMENT B-1**

**ITEMS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 2251, 2252, and 2252A:

1. Any communications with minors or communications with adults regarding minors;

2. Any information pertaining to any individual's sexual interest in minors;

3. Any information in digital or hard-copy format regarding the Twitter Application, ownership of Twitter accounts, and any information regarding other accounts accessed by or communicated with accounts **VST10249297** and **VST09361525**.

4. Any child pornography or visual depictions of minors engaged in sexually explicit conduct in any form;

5. Any child erotica;

6. All screen names, user names, and true names of others who may have operated as the source of child pornography or visual depictions of minors engaged in sexually explicit conduct, in any format, downloaded and possessed by the target computer(s);

7. Any items, images, documents, communications, records, and information pertaining to 1) any sexual conduct with a minor(s); 2) the possession, receipt, distribution, or production of child pornography; or 3) the sexually explicit communications with a minor(s) or adult(s) in relation to minors, that affected or were transmitted or received via computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail, including:

   a. Envelopes, letters, and other correspondence including, electronic mail, chat logs, and electronic or other instant messages, establishing possession, access to, affect on, or transmission through interstate or foreign commerce, including by United States mail

1

or via computer, of child pornography or visual depictions of minors engaged in sexually explicit conduct;

    b.   Books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind affecting interstate or foreign commerce or involving the transmission via interstate or foreign commerce, including by U.S. mail or by computer, of any communications regarding a sexual interest in minors;

    c.   Credit card information, including bills and payment information, regarding Internet service; purchase of computer hardware, software, or storage media; purchase of or payment for memberships to web sites and/or chat applications;

    d.   Records evidencing occupancy or ownership of the premises described above, including utility/telephone bills or addressed correspondence; and

    e.   Records or other items that indicate ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes.

8.   Computers or storage media used as a means to commit the violations described above.

9.   For any computer hard drive, cellular telephone/hybrid, or other electronic media (hereinafter "COMPUTER") found to contain information otherwise called for by this warrant:

    a.   Evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, viewed, or deleted, such as logs, registry entries, saved user names and passwords, documents, and browsing history, to include bookmarked sites;

    b.   Evidence of malicious software ("malware");

    c.   Evidence of the lack of such malicious software;

    d.   Evidence of the attachment to the COMPUTER of other storage devices, disks, CD-ROMS, or similar containers for electronic evidence;

    e.   Evidence of the times the COMPUTER was used;

f.  Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

g.  Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

h.  Evidence indicating the computer user's state of mind as it relates to the crime under investigation;

i.  Evidence identifying the location from which sexually explicit communications were held, including date and time of such communications;

j.  Any and all photos or videos that may have been sent or received as part of a text or e-mail conversation relating to sexual interest in minors, to include date and time of the receipt or send of such files;

k.  Evidence identifying whether communications were deleted, to include date and time of deletion;

l.  Contents of volatile memory related to computers and other digital communication devices that would tend to show the current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details necessary to preserve the true state of running evidence;

m.  Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address;

n.  Records of or information about Internet Protocol addresses used by the COMPUTER;

o.  Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; and

p.  Contextual information necessary to understand the evidence described in this attachment.

10. Routers, modems, and network equipment used to connect computers to the Internet.

   If computers or other digital devices are found in a running state, evidence may be acquired from the devices prior to shutting the devices off.

   As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

   The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

   The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media

11. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| | )     Case No.     2:20-sw-1119 AC |
| 8507 Central Ave, Orangevale, CA 95662 | ) |
| | )     **SEALED** |
| | ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-1, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B-1, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ December , 2020 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: an authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    December 9, 2020 @ 4:35 p.m.

City and state:     Sacramento, California

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____        _____
Signature of Judge                                                    Date

### ATTACHMENT A-1

### DESCRIPTION OF LOCATION TO BE SEARCHED



The location known as **8507 Central Ave, Orangevale, CA 95662** is identified as follows:  A

single-story residence with cream coloring and light brown trim.  There is a two-car garage located

at the front of the house. The numerals "8507" are offset and nailed to the front of the house. The

numerals "8507" are painted in black and white on the sidewalk directly in front of the home.

Google maps also identified this location as **8507 Central Ave, Orangevale, CA 95662.**  The

premises to be searched includes all rooms, attics, basements, and other parts therein, the

surrounding grounds and any garages, storage rooms, or outbuildings of any kind located thereon or

in the possession of the occupants of 8507 Central Ave, Orangevale, CA 95662.  Additionally, the

premises to be searched includes Joey D. Campbell and anywhere within the premises of cellular

devices or other digital devices or media may be found, including vehicles parked on the premises.

**ATTACHMENT B-1**

**ITEMS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 2251, 2252, and 2252A:

1. Any communications with minors or communications with adults regarding minors;

2. Any information pertaining to any individual's sexual interest in minors;

3. Any information in digital or hard-copy format regarding the Twitter Application, ownership of Twitter accounts, and any information regarding other accounts accessed by or communicated with accounts **VST10249297** and **VST09361525**.

4. Any child pornography or visual depictions of minors engaged in sexually explicit conduct in any form;

5. Any child erotica;

6. All screen names, user names, and true names of others who may have operated as the source of child pornography or visual depictions of minors engaged in sexually explicit conduct, in any format, downloaded and possessed by the target computer(s);

7. Any items, images, documents, communications, records, and information pertaining to 1) any sexual conduct with a minor(s); 2) the possession, receipt, distribution, or production of child pornography; or 3) the sexually explicit communications with a minor(s) or adult(s) in relation to minors, that affected or were transmitted or received via computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail, including:

   a. Envelopes, letters, and other correspondence including, electronic mail, chat logs, and electronic or other instant messages, establishing possession, access to, affect on, or transmission through interstate or foreign commerce,

including by United States mail or via computer, of child pornography or visual depictions of minors engaged in sexually explicit conduct;

b. Books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind affecting interstate or foreign commerce or involving the transmission via interstate or foreign commerce, including by U.S. mail or by computer, of any communications regarding a sexual interest in minors;

c. Credit card information, including bills and payment information, regarding Internet service; purchase of computer hardware, software, or storage media; purchase of or payment for memberships to web sites and/or chat applications;

d. Records evidencing occupancy or ownership of the premises described above, including utility/telephone bills or addressed correspondence; and

e. Records or other items that indicate ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes.

8. Computers or storage media used as a means to commit the violations described above.

9. For any computer hard drive, cellular telephone/hybrid, or other electronic media (hereinafter "COMPUTER") found to contain information otherwise called for by this warrant:

a. Evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, viewed, or deleted, such as logs, registry entries, saved user names and passwords, documents, and browsing history, to include bookmarked sites;

b. Evidence of malicious software ("malware");

c. Evidence of the lack of such malicious software;

3

d.  Evidence of the attachment to the COMPUTER of other storage devices, disks, CD-ROMS, or similar containers for electronic evidence;

e.  Evidence of the times the COMPUTER was used;

f.  Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

g.  Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

h.  Evidence indicating the computer user's state of mind as it relates to the crime under investigation;

i.  Evidence identifying the location from which sexually explicit communications were held, including date and time of such communications;

j.  Any and all photos or videos that may have been sent or received as part of a text or e-mail conversation relating to sexual interest in minors, to include date and time of the receipt or send of such files;

k.  Evidence identifying whether communications were deleted, to include date and time of deletion;

l.  Contents of volatile memory related to computers and other digital communication devices that would tend to show the current and recent use of the computer, use of encryption, use of other communications devices, routes of Internet and other digital communications traffic and passwords, encryption keys or other dynamic details necessary to preserve the true state of running evidence;

m.  Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address;

n.  Records of or information about Internet Protocol addresses used by the COMPUTER;

o.  Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; and

p.  Contextual information necessary to understand the evidence described in this attachment.

10. Routers, modems, and network equipment used to connect computers to the Internet. If computers or other digital devices are found in a running state, evidence may be acquired from the devices prior to shutting the devices off.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media

11. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for

the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.